# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **EVARISTE KABURA**,<br><br>    **Petitioner,**<br><br><br>    vs.<br><br>**LAURA MCNEER, Field Director, Salt Lake City Field Office, United States Citizenship and Immigration Services, et al.,**<br><br>    **Respondents.** | **MEMORANDUM DECISION AND ORDER APPROVING AND GRANTING MR. KABURA'S APPLICATION FOR NATURALIZATION AND REMANDING MATTER TO USCIS TO FINALIZE HIS NATURALIZATION**<br><br><br>**Case No. 2:17-cv-881**<br><br>**Judge Clark Waddoups** |

Before the court is Petitioner Evariste Kabura's Petition for Judicial Review for Naturalization (the "Petition") (ECF No. 2), which asks the court to review his application for naturalization and render a decision on the same. For the reasons stated herein, Mr. Kabura's Application for Naturalization is **APPROVED AND GRANTED**.

## BACKGROUND

Mr. Kabura was born in a refugee camp in Rawanda. When he was fifteen, his family fled genocide in Rawanda and spent approximately fourteen years in Tanzania. In June of 2007, he and his family, including his wife and their four children, came to the United States as refugees. Mr. Kabura was granted permanent resident status at that time. In March 2010, Mr. Kabura was charged with, and convicted of, violating a temporary protective order that was imposed while he and his wife were legally separated (the "Violation"). The basis of the Violation was that he had attempted to call his wife on more than one occasion.

Mr. Kabura applied for naturalization to become a citizen of the United States on August

12, 2016.  His application for naturalization included all relevant information regarding his conviction for violating the temporary protective order.  He thereafter had an interview and examination with the United States Citizenship and Immigration Services ("USCIS") on December 21, 2016, and he passed all tests and requirements.  After the examination, USCIS requested additional information regarding Mr. Kabura's Violation, and Mr. Kabura timely responded to the request.

On July 28, 2017, over 200 days after his examination, USCIS issued a notice to appear (the "Notice to Appear") to Mr. Kabura that notified him he was removable from the United States due to the Violation.  (ECF No. 19-3).  The Notice to Appear did not include the date and time of his removal hearing.  Thereafter, on August 3, 2017, Mr. Kabura filed his Petition, arguing that because USCIS had exceeded the statutorily-permitted 120-day period to render a decision on his application for naturalization, the court could, and should, render a decision in its place.

The United States promptly moved to dismiss the Petition, arguing that the filing of the Notice to Appear had commenced removal proceedings against Mr. Kabura, and that pursuant to 8 U.S.C. § 1429, the court no longer had jurisdiction to hear Mr. Kabrua's request.  (ECF No. 10).  The court granted the motion to dismiss and closed this matter (ECF No. 27), and Mr. Kabura thereafter moved to alter or amend asking the court to reconsider the dismissal.  (ECF No. 29).  The court ultimately granted Mr. Kabura's motion and reopened this matter on the basis that because the Notice to Appear did not comply with the governing statute, removal proceedings had not been commenced against him, and the court was not, therefore, stripped of its jurisdiction to render a decision on his Petition.  (ECF No. 32).  Thereafter, on November 6, 2019, USCIS served Mr. Kabura with a notice of hearing stating that his hearing is set for March

27, 2020 (the "Notice of Hearing"). (ECF No. 56-2). The United States also moved the court to reconsider its order reopening this matter, which the court denied on March 9, 2020. (ECF No. 58).

The court held an evidentiary hearing on Mr. Kabura's Petition on March 4, 2019 (the "Evidentiary Hearing"). (ECF No. 42). Mr. Kabura offered testimony from himself and two witnesses at the hearing, and although the United States appeared and opposed Mr. Kabura's petition, it neither called witnesses nor offered evidence. Both sides have submitted post-hearing briefs and supported their positions through filing supplemental authority. (ECF Nos. 45, 50, 51, 52, 53, 54, 55, 56, 57 & 59). The matter is ripe for adjudication.

## LEGAL STANDARD

Pursuant to 8 U.S.C. § 1447(b), if USCIS fails to make a determination on an applicant's application for naturalization within 120 days after the date on which the applicant's examination is conducted, the applicant "may apply to the United States district court for the district in which the applicant resides for a hearing on the matter." That court then "has jurisdiction over the matter and may either determine the matter or remand the matter, with appropriate instructions, to [USCIS] to determine the matter."

An applicant for naturalization bears the burden of establishing that he satisfies the basic qualifications for naturalization. 8 U.S.C. § 1427(e). These qualifications include showing that he:

1. has been "lawfully admitted to the United States for permanent residence." 8 U.S.C. § 1429;

2. has "resided continuously, after being lawfully admitted for permanent residence, within the United States for at least five years . . . ." 8 U.S.C. § 1427(a);

3. "has resided continuously within the United States from the date of the application up to the time of admission to citizenship," *id.*;

4. "has been and [for all relevant period] still is a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States," *id*.;

5. can demonstrate "an understanding of the English language . . ." and "a knowledge and understanding of the fundamentals of the history, and of the principles and form of government, of the United States," 8 U.S.C. § 1423(a);

6. has made and filed a sworn and signed application with the Attorney General that includes "all facts which in the opinion of the Attorney General may be material to the applicant's naturalization, and required to be proved . . . ." 8 U.S.C. § 1445(a); and

7. has had an investigation conducted on him by the USCIS, 8 U.S.C. § 1446(a).

Once it is determined that an applicant has established that he satisfies these requirements, his application can be approved and he is then able to be naturalized by taking the "oath of renunciation and allegiance" (the "Oath"). 8 U.S.C. § 1448(a). Once an applicant takes the Oath, he is entitled to receive a certificate of naturalization (the "Certificate of Naturalization") from USCIS. 8 U.S.C. § 1449.

## FINDINGS OF FACT

1. Mr. Kabura was born in a refugee camp in Rawanda on May 15, 1978. (ECF No. 47 at 34:12–18). His parents were from Burundi but had fled the country due to civil war and arrived in Rawanda. (*Id.* at 34:23–25).

2. In April 1994 Mr. Kabura and his family fled Rawanda due to genocide war and went to Tanzania. (*Id.* at 35:4–8). They remained in Tanzania for fourteen years. (*Id.* at 35:11–12).

3. In June of 2007 Mr. Kabura came to the United States as a refugee with Divina Ndayisenga who was at that time his wife, their four children, his parents, and his brothers and sisters. (*Id.* at 34:20–36:24).

4

4.      Mr. Kabura holds a permanent resident card displaying a residency date of June 27, 2007.  (ECF No. 2-7).

5.      Mr. Kabura never gained citizenship or nationality from Rwanda or Tanzania. (ECF No. 47 at 35:13–19).

6.      At some point in or around 2010, Mr. Kabura and Ms. Ndayisenga separated, and on March 5, 2010, a temporary protective order (the "Protective Order") was filed against Mr. Kabura.  (ECF No. 2-4).

7.      The Protective Order was dissolved on March 24, 2010, because Ms. Ndayisenga failed to appear for court.  (ECF No. 2-4).

8.      Mr. Kabura was charged with violation the Protective Order on allegations that he called Ms. Ndayisenga numerous times during the month of March 2010.  (ECF No. 2-6).  Ms. Ndayisenga only answered one call from Mr. Kabura, and it was after the Protective Order had been dissolved.  (*Id.*)  There were no reports or allegations of injury, property damage, threats, or harassment, and a permanent protective order was never issued against Mr. Kabura.  (*Id.*)  Mr. Kabura represented that given his upbringing, he did not know what the Protective Order meant. (*Id.*)

9.      Charges against Mr. Kabura were filed on May 17, 2010, for violating the Protective Order by calling Ms. Ndayisenga.  (*Id.*).  Following a jury trial held on November 3, 2010, Mr. Kabura was found guilty of one count of Violation of a Protective Order, a Class A Misdemeanor (the "Violation").  (*Id.*)  Mr. Kabura was sentenced to 12 months' probation, which he successfully completed.  (*Id.*; ECF No. 2 at ¶ 27; ECF No. 45-6)

10.     Mr. Kabura never committed any violent acts against his ex-wife and never physically harmed or threatened her.  (ECF No. 47 at 41:4–12).

11.     Mr. Kabura and Ms. Ndayisenga divorced by Decree of Divorce and Judgment dated August 12, 2015.  (ECF No. 2-8).  Pursuant to that order, Mr. Kabura is required to pay child support.  (*Id.*).  Mr. Kabura regularly pays his child support, is up to date on all support payments.  (ECF No. 47 at 39:2–41:3).

12.     Mr. Kabura and Ms. Ndayisenga have a good relationship.  (ECF No. 47 at 38:8–16).

13.     On August 12, 2016, Mr. Kabura completed an application for naturalization to become a citizen of the United States (the "Application").  (ECF No. 2-1).  USCIS received the Application on September 12, 2016.  (ECF No. 2-2).

14.     Mr. Kabura disclosed his conviction regarding the Violation, and the facts surrounding it, in his Application.  (ECF No. 2-1).

15.     Mr. Kabura had no other criminal record.  (ECF No. 2-1).

16.     On December 21, 2016, Mr. Kabura appeared to the USCIS for an interview and examination on his Application.  (ECF No. 2-2).  Mr. Kabura passed the requirements for English, U.S. History, and U.S. Government, and he met the requirements for continuous presence within the United States and passed all of his exams.  (ECF No. 47 at 41:13–24; ECF No. 2 at ¶ 5).

17.     After the examination, USCIS requested additional information regarding the Violation, which Mr. Kabura timely provided.  (ECF No. 2 at ¶ 5–6).

18.     An internal memorandum dated April 6, 2017 regarding Mr. Kabura's application summarized the Violation and recommended that a notice to appear "*not* be issued in this case." (ECF No. 45-5 (emphasis is original)).

19.     On June 13, 2017, the "NTA Review Panel" convened and reviewed the

recommendation contained in the internal memorandum and concluded that a notice to appear should be issued because the Violation would "be able to sustain removability." (*Id*.).

20. USCIS did not take issue, and to date has not contested, any of the other requirements Mr. Kabura must establish in order to have his Application approved.

21. USCIS did not deny, and to date has not denied, Mr. Kabura's Application.

22. On July 28, 2017, USCIS issued the Notice to Appear to Mr. Kabura notifying him that he was removable from the United States due to the Violation. (ECF No. 19-3). The Notice to Appear states that the date and time of his removal hearing were "to be set." *Id.*

23. Thereafter, on August 3, 2017, Mr. Kabura filed his Petition asking this court, pursuant to 8 U.S.C. § 1447(b), to review his Application and render a decision on the same. (ECF No. 2).

24. Almost three weeks later, on August 24, 2017, the Notice to Appear was received by the Department of Justice. (ECF No. 19-3).

25. On November 6, 2019, USCIS served Mr. Kabura with a Notice of Hearing that provided that his removal hearing was scheduled to occur on March 27, 2020. (ECF No. 56-2).

26. On March 4, 2019, the court held an Evidentiary Hearing on Mr. Kabura's Petition. (ECF No. 42). Mr. Kabura provided testimony on his own behalf and from two character witnesses, Kelly Dick and Rachel Blackmer. (*See* ECF No. 47 at 34:8–61:5). Although the United States appeared and opposed Mr. Kabura's petition, it neither called witnesses nor admitted evidence to counter Mr. Kabura's claims that he had established all requirements for naturalization.

**CONCLUSIONS OF LAW**

1.    Because USCIS did not make a determination on Mr. Kabura's Application within 120 days of his examination, Mr. Kabura petitioned this court to determine the matter. Pursuant to 8 U.S.C. § 1447(b), the court "has jurisdiction over the matter and may either determine the matter or remand the matter, with appropriate instructions, to [USCIS] to determine the matter."

2.    Neither the filing of the Notice to Appear nor the Notice of Hearing has stripped the court of its jurisdiction to decide Mr. Kabura's Application.

3.    Because Mr. Kabura filed his Petition before the Notice to Appear was received by the Immigration Court, at the time this court obtained jurisdiction over this matter, removal proceedings had not yet commenced against Mr. Kabura. *See* 8 C.F.R. § 1003.14 (recognizing that removal proceedings commence "when a charging document is filed with the Immigration court"); 8 C.F.R. § 1003.13 (defining "filing" as "the actual receipt of a document by the appropriate Immigration Court"); (*compare* ECF No. 2 *with* ECF No. 19-3).

4.    The court was not stripped of its jurisdiction to determine Mr. Kabura's Petition when the Notice to Appear was filed with the Immigration Court. *See Yith v. Nielsen*, 881 F.3d 1155, 1165 (9th Cir. 2018) (recognizing that language in 8 U.S.C. § 1429 preventing the Attorney General from naturalizing a person against whom removal proceedings were pending did not so limit a district court that obtained jurisdiction to decide a petition pursuant to 8 U.S.C. § 1447(b)).

5.    Mr. Kabura has met his burden of establishing that he satisfies the basic qualifications for naturalization. *See* 8 U.S.C. § 1427(e).

6.    Mr. Kabura has established that he has been "lawfully admitted to the United

States for permanent residence" as required is by 8 U.S.C. § 1429.  (ECF No. 2-7).

7.      Mr. Kabura has established that he has "resided continuously, after being lawfully admitted for permanent residence, within the United States for at least five years" as is required by 8 U.S.C. § 1427(a).  (*See* ECF Nos. 2-1; 2-7; 47 at 37:18–20).

8.      Mr. Kabura has established that, to date, he "has resided continuously within the United States" as is required by 8 U.S.C. § 1427(a).  (*See* ECF Nos. 2-1; 2-7; 47 at 37:18–20). As with any applicant for naturalization, it is impossible for Mr. Kabura, at this time, to establish his residency "up to the time of admission to citizenship."  Because such a determination can only be made once Mr. Kabura is actually admitted to citizenship, USCIS requires persons scheduled to take the Oath to bring with them a completed Form N-445, Notice of Naturalization Oath Ceremony, which, among other things, has them verify their continued residency.  Satisfied that his continued residency will be confirmed at his naturalization, as it must be, the court finds that Mr. Kabura has established his residency to date and an intent to remain a resident and has therefore satisfied, to date, the requirements of 8 U.S.C. § 1427(a).

9.      Mr. Kabura has established that he has "during all the periods referred to in this subsection has been and still is a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States," as is required by 8 U.S.C. § 1427(a).  (*See* ECF No. 47 at 34:8–61:5).

10.     Mr. Kabura has demonstrated "an understanding of the English language . . ." and "a knowledge and understanding of the fundamentals of the history, and of the principles and form of government, of the United States" as is required by 8 U.S.C. § 1423(a).  (ECF No. 47 at 41:20–24).

11.     Mr. Kabura has made and filed a sworn and signed application with the Attorney

General that includes "all facts which in the opinion of the Attorney General may be material to the applicant's naturalization, and required to be proved . . . " as is required by 8 U.S.C. § 1445(a).  (*See* ECF No. 2-1).

12.     Mr. Kabura has had an investigation conducted on him by the USCIS as is required by 8 U.S.C. § 1446(a).

13.     Mr. Kabura has satisfied all requirements necessary for his Application to be approved.

14.     Once the court approves his Application, he is entitled to be naturalized by USCIS by taking the Oath and receiving a Certificate of Naturalization.

15.     Because Mr. Kabura failed to timely request that the court to administer the Oath, as required under 8 C.F.R. § 310.3, the court does not have the authority to independently administer the Oath to him.  The court notes, however, that USCIS may, pursuant to the relief granted herein, schedule Mr. Kabura to have the Oath administered at a public ceremony conducted by this court.

16.     8 U.S.C. § 1429 does not preclude USCIS from naturalizing Mr. Kabura because there is not "a final finding of deportability pursuant to a warrant of arrest" issued against him.

17.     Moreover, 8 U.S.C. § 1429 does not preclude USCIS from scheduling Mr. Kabura to have the Oath administered to him or from preparing and awarding him a Certificate of Naturalization, as ordered herein, because 1) these actions do not require USCIS to consider Mr. Kabura's application for naturalization—by this order, the court has considered, and approved that application and 2) because any removal proceeding commencing against Mr. Kabura was not commenced "pursuant to a warrant of arrest . . . ."

**DISCUSSION**

Many of the court's findings of fact and conclusions of law are uncontested.  The primary disputed issue in this matter are whether the court continues to have jurisdiction over this matter and whether Mr. Kabura has established that he is a "person of good moral character."

A. <u>**The court has jurisdiction to determine Mr. Kabura's Application and to grant the relief issued herein.**</u>

USCIS conducted its examination on Mr. Kabura on December 21, 2016.  Because USCIS failed to make a determination on Mr. Kabura's Application within 120 days of that examination, under 8 U.S.C. § 1447(b), Mr. Kabura was permitted to apply to this court "for a hearing on the matter."  He did so by Petition filed on August 3, 2017, and at that time the court obtained jurisdiction over this matter, holding the ability to "either determine the matter or remand the matter, with appropriate instructions, to [USCIS] to determine the matter."  8 U.S.C. § 1447(b).  This is not in dispute.

What is disputed by Respondents is that when USCIS issued a Notice to Appear against Mr. Kabura, the court at that point lost its jurisdiction to hear Mr. Kabura's petition pursuant to 8 U.S.C. § 1429.  Respondents argue that under § 1429, once removal proceedings are commenced against an alien, the court can no longer act to naturalize him.  While the court has previously addressed this argument, a recent Tenth Circuit decision requires that the issue be further discussed.  Initially, the court found that because the Notice to Appear that Mr. Kabura received did not contain the date and time of his removal proceedings, it was invalid and therefore as a matter of law ineffective to initiate removal proceedings.  (*See* ECF No. 58).  The Tenth Circuit has recently rejected this reasoning, determining that the statutory requirements that a notice to appear include the date and time of a removal proceeding were "claim-processing rules" and that USCIS's failure to provide that information did not preclude an immigration court from having

jurisdiction.  *See Martinez-Perez v. Barr*, 947 F.3d 1273, 1277–79 (10th Cir. 2020).

Although *Martinez-Perez* calls into question the court's prior explanation for retaining jurisdiction over Mr. Kabura's petition, it does not require that the court conclude that it has been deposed of jurisdiction.[1]  Even when it is accepted that the Notice to Appear may have been effective to commence removal proceedings against Mr. Kabura, under the plain language of the governing statutes and regulations,  those proceedings did not actually commence until the notice is was actually received by the Immigration Court.  *See* 8 C.F.R. § 1003.14 (recognizing that removal proceedings commence "when a charging document is filed with the Immigration court"); 8 C.F.R. § 1003.13 (defining "filing" as "the actual receipt of a document by the appropriate Immigration Court").  Here, the Immigration Court received the Notice to Appear on August 24, 2017, nearly three weeks after Mr. Kabura filed his Petition, and this court had already obtained jurisdiction over the same.  (ECF No. 19-3).  Thus, the underlying question presented is whether 8 U.S.C. § 1429 acts to strip a district court of its jurisdiction to determine a petition under 8 U.S.C. § 1447(b), when removal proceedings are commenced *after* a district court obtains that jurisdiction.[2]

Two provisions of 8 U.S.C. § 1429 are relevant here.  The first states that "no person shall be naturalized against whom there is outstanding a final finding of deportability pursuant to a warrant of arrest issued under the provisions of this chapter or any other Act" and the second

---

[1] Although the court's Order reopening this matter (ECF No. 33) is generally based on the same logic that has since been questioned by *Martinez-Perez*, the court could have set aside its motion to dismiss and reopened this matter based on the the analysis discussed herein—that 8 U.S.C. § 1429 simply does not strip the court of its jurisdiction to decide Mr. Kabura's petition pursuant to 8 U.S.C. § 1447(b).

[2] Respondents also argue that the court lacks jurisdiction under 8 U.S.C. §§ 1252(a)(5), (b)(9) and (g). Those provisions govern a court's review of challenges, both direct and indirect, to an order of removal, and therefore do not apply here.  No order of removal has been issued, no removal order is being challenged, even indirectly, and the granted herein is neither concerned with, nor dependent on, any potential issues involving the commencement of removal proceedings.

states that "no application for naturalization shall be considered by the *Attorney General* if there is pending against the applicant a removal proceeding pursuant to a warrant of arrest issued under the provisions of this chapter or any other Act."  8 U.S.C. § 1429 (emphasis added). Respondents argue that these provisions limit a district court's authority under 8 U.S.C. § 1447(b) to determine an alien's application.  An analysis of the plain language of both provisions shows that neither applies to the facts of this case and that neither controls a district court's power and jurisdiction.

The first provision prevents the naturalization of an application "against whom there is outstanding a final finding of deportability pursuant to a warrant of arrest . . . ."  Here, no final finding of deportability has been made against Mr. Kabura; his Application has never been denied, and it is still in proceedings before USCIS.  Moreover, Mr. Kabura was issued, and his removal proceedings commenced pursuant to, a notice to appear, not a "warrant of arrest."  As the Ninth Circuit recognized in *Yith v. Nielsen*, 881 F.3d 1155, 1166 (9th Cir. 2018), a warrant of arrest is a "distinct document" from a notice to appear, and if "Congress intended to preclude the government's consideration of a naturalization petition whenever the applicant was in removal proceedings, then it would have had no need to state that § 1429 is applicable only when a removal proceeding is 'pursuant to a warrant of arrest.'  [Respondents'] interpretation would make 'pursuant to a warrant of arrest' unnecessary, which is contrary to our general reluctance to treat statutory terms as surplusage."  *Id.* (internal quotations omitted, citing *Bd. of Trs. of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 563 U.S. 776, 788 (2011)).  Because Mr. Kabura was issued a notice to appear, not a warrant of arrest, to the extent that the first provision would limit the court's jurisdiction and authority, it does not apply here.

The second provision is not applicable for the same reason—Mr. Kabura's removal

proceeding was initiated pursuant to a notice to appear, not a warrant of arrest. Further, and

more importantly, even if Mr. Kabura had been issued a warrant of arrest, this provision only

prohibits the *Attorney General*, not a district court, from considering an application for

naturalization while removal proceedings are pending. Respondents, relying on the non-binding

Second Circuit decision *Ajlani v. Chertoff*, 545 F.3d 229, 240 (2d Cir. 2008), argue that this

provision also bars a district court from considering an application, as a district court's "authority

to grant naturalization relief while removal proceedings are pending cannot be greater than that

of the Attorney General."

      This argument ignores the "cardinal principle of statutory construction that if

the language is clear and unambiguous, the plain meaning of the statute controls." *United States

v. Brody*, 621 F. Supp. 2d 1196, 1198 (D. Utah 2009) (quoting *United States v. Husted*, 545 F.3d

1240, 1243 (10th Cir.2008) (internal quotations omitted; quote cleaned up). Under this principle,

"[w]hen interpreting a statute, a court first looks to the statute's text. 'If the words of the

relevant statute are unambiguous, our inquiry progresses no further.'" *Id.* (quoting *Husted*, 545

F.3d at 1242–43). Here, the text of the relevant provision of § 1429 unambiguously states that it

applies to the Attorney General. It is therefore improper to go beyond that clear language to

interpret the provision to also apply to a district court. *See Yith*, 881 F.3d at 1161–62

(recognizing that § 1429 "refers only to the Attorney General and provides no indication that the

language applies to the courts" and that "[i]nterpreting the narrower limitation that 'no

application for naturalization shall be considered by the Attorney General' to mean the same as

'no person shall be naturalized' would [improperly] read out the reference to the Attorney

General and treat distinct clauses as identical"); *see also Dilone v. Nielsen*, 358 F. Supp. 3d 490,

501 (D. Md. 2019) ("Nothing in the text of § 1429 bars the court from exercising [its authority

under § 1447(b)]. And while some courts have entertained the possibility that Congress meant to constrain not only the Attorney General, but the courts as well, this assumption is at odds with what Congress actually did. The fact is § 1429 used to bar courts from hearing naturalization petitions while removal proceedings were under way; that statutory bar was on the books for decades, but Congress effectively deleted it." (citation omitted)).  This required interpretation is strengthened by the fact that the court and the Attorney General are separate and distinct branches of government.  To ignore that distinction would equate the judicial branch to the executive branch, inapposite to years of constitutional analysis to the contrary.

Respondents' insistence that § 1429 must be read to strip the court of jurisdiction to decide Mr. Kabura's Application is premised on a flawed insistence that the court's handling of this matter is an infringement on USCIS's "sole authority to naturalize persons as citizens of the United States."  8 U.S.C. § 1421(a).  But such a broad, and blanketing, interpretation of § 1421(a) would negate the express authority given to district courts in § 1447(b), an action the Congress expressly declined to take.  When Congress passed The Immigration Act of 1990, it dictated, in § 1421(a), that the Attorney General (now USCIS) has "sole authority to naturalize persons as citizens of the United States, " but it "did not eliminate the courts' role entirely. Rather, in recognition of 'the long-standing power the district courts had possessed over naturalization applications,' the law 'reserved a measure of naturalization jurisdiction for the courts in two circumstances: denial and delay.'"  *Dilone*, 358 F. Supp. 3d at 496 (quoting 8 U.S.C. § 1421(a); *Etape v. Chertoff*, 497 F.3d 379, 386 (4th Cir. 2007); *Ajlani v. Chertoff*, 545 F.3d 229, 236 (2d Cir. 2008)).  As such, when read in harmony, as Congress by necessity intended them to be, §§ 1447(b) and 1421(a) show that a district court can decide an application for naturalization without infringing on USCIC's sole authority to naturalize persons.

This harmonious reading is consistent with the designations of power and authority set forth in various other provisions of the Immigration Act of 1990. An applicant is actually "naturalized" when he takes the Oath of Renunciation and Allegiance pursuant to 8 U.S.C. § 1448 and receives a ministration certificate of naturalization from USCIS pursuant to 8 U.S.C. § 1449. USCIS is still in charge of facilitating both of these final functions of naturalization, and the relief granted by this order does not infringe on USCIS's authority in those regards. In short, while an applicant's final naturalization is solely controlled by USCIS, 8 U.S.C. § 1447(b) takes a portion of the process that an applicant must follow to obtain that naturalization—a mere "measure of naturalization jurisdiction"—and, in limited circumstances, allows the district court to determine it. *See Dilone*, 358 F. Supp. 3d at 496 (citations omitted). The final process by which an alien is actually naturalized remains the sole province of USCIS.

The court's involvement in Mr. Kabura's naturalization is limited to its review of his Application for Naturalization, and the relief herein granted is similarly limited to its determination that Mr. Kabura has satisfied the requirements to have his Application approved. Moreover, the relief granted, and the directions given to USCICS herein, do not violate 8 U.S.C. § 1429 because 1) they do not require USCIS to consider Mr. Kabura's application for naturalization—by this order, the court has considered, and approved that application and 2) any removal proceeding commencing against Mr. Kabura was not commenced "pursuant to a warrant of arrest . . . ." Thus, the court, and the relief granted by this Order, is within the power granted to it in § 1447(b) and is not precluded by §§ 1421(a) or 1429. *See Dilone*, 358 F. Supp. 3d at 503 (finding that "[n]othing in the statutory text or in the case law persuades me that [USCIS's] subsequent decision to place [an alien] removal proceedings [after the district court obtain jurisdiction under § 1447(b)] left the Court powerless to act on the petition")).

**B.** **Mr. Kabura has established that he is a person of good moral character, but pursuant to its customary regulations and procedures, USCIS is permitted to conduct an updated background check to ensure that he has maintained that status.**

A review of Mr. Kabura's Application and the evidence presented at the Evidentiary Hearing shows that the only potential stain on his character is the 2010 technical Violation. Aside from this isolated instance, Mr. Kabura has shown that he is a caring and responsible father who financially provides for his children and is an integral member of his community, one who regularly volunteers his time to help others learn English. Thus, the question before this court, as it reviews Mr. Kabura's Application, is whether the Violation alone shows that Mr. Kabura is not a person of good moral character.

8 U.S.C. § 1101(f) and 8 C.F.R. § 316.10 provide examples of actions, activities, and/or convictions that demonstrate that someone lacks good moral character. The Violation does not fall within any of these enumerated examples. However, 8 C.F.R. § 316.10(b)(3) provides a catch-all, stating that an applicant can be found to lack good moral character if he "committed unlawful acts that adversely reflect upon the applicant's moral character" and cannot establish "extenuating circumstances." *See also United States v. Hsu*, 695 F. App'x 393, 396 (10th Cir. 2017). Such a determination must be made "on a case-by-case basis taking into account the elements enumerated in [8 C.F.R. § 316.10] and the standards of the average citizen in the community of residence." 8 C.F.R. § 316.10(a)(2). The court finds that Mr. Kabura's Violation does not rise to the level of adversely reflecting upon his moral character, and that even if it did, he has established extenuating circumstances that mitigate

Here, the Violation stems from Mr. Kabura making "several attempts" to contact his then wife, during the couple's legal separation, in violation of a court-issued temporary protective

order.  (*See* ECF No. 2-1, Ex. C).  While this is a technical offense, the gravity of the offense is mitigated by the following extenuating circumstances: 1) Mr. Kabura provided a statement saying he "did not know anything about [the] protective order" (*id.*); 2) that the concept of a protective order was foreign to Mr. Kabura because he grew up in refugee camps where there were "not documents, no judges, no writing, [and] no served paperwork" (*id.*); 3) the protective order Mr. Kabura was convicted of violating was dissolved when his then-wife failed to appear at a hearing to pursue it (ECF No. 2-1, Ex. A); 4) once Mr. Kabura understood the requirements, he thereafter complied with all orders that were entered in his divorce proceeding, which supports his explanation that he was unaware of the limitations placed by the first order (*see id.*); 5) the Violation did not result in any actual contact or communications between Mr. Kabura and his then-wife (ECF No. 2-1, Ex. C); 6) there was never an allegation that Mr. Kabura had threatened or acted violently towards his then-wife (*id.*; ECF No. 47 at 41:4–12); and 7) that Mr. Kabura successfully completed his term of probation (*see* ECF No. 45-6).

The evidence Mr. Kabura has submitted leads to court to conclude that although he committed a technical violation of the temporary protective order, that Violation does not "adversely reflect upon [his] moral character" and that he is still "a person of good moral character."  *See* 8 U.S.C. § 1427(a).  As this was the only requirement for naturalization that Respondents actually contest, the court, having found that it is met, **HERBEY APPROVES AND GRANTS** Mr. Kabura's Application for Naturalization.

While Respondents argue that Mr. Kabura cannot be naturalized because a thorough investigation has not been conducted on him, it is clear that Mr. Kabura has, in fact, been investigated in compliance with 8 U.S.C. § 1446(a), as such an investigation was required to have been completed before his initial examination was even scheduled.  *See* 8 C.F.R. § 335.2(b)

("USCIS will notify applicants for naturalization to appear before a USCIS officer for initial examination on the naturalization application only after the USCIS has received a definitive response from the Federal Bureau of Investigation that a full criminal background check of an applicant has been completed."). Respondents real contention with the investigation completed on Mr. Kabura is not that it was insufficient, but merely that it needs to be updated. Such a contention, even if accepted, does not preclude Mr. Kabura's Application from being approved.

In essence, Respondents argue that further examination is needed to ensure that Mr. Kabura is *still* a person of good moral character. Citing internal policies, they argue that because the USCIS examination conducted on Mr. Kabura was completed over three years ago, they need to complete "one last background check before an oath ceremony, if any, is scheduled" to "ensure that [Mr. Kabura] continues to meet the good moral character [requirement] up to and including the time of taking the oath." (ECF No. 50 at 42). Such a contention does not go to the merits of Mr. Kabura's Application, as these updated checks, which are "conducted two days and one day before the applicant takes the oath of allegiance," are always performed *after* an applicant's application for naturalization has been approved. Indeed, it appears that these requirements, as well as the requirement that an applicant establish that he is still a resident of the United States, are satisfied through the applicant's completion of USCIS's Form N-445, Notice of Naturalization Oath Ceremony. After all, the purpose of that form, which is to be brought by the applicant to the oath ceremony, is "to enable Adjudications Officers of [USCIS] to determine an applicant's eligibility for naturalization." *See* Form N-445, Notice of Naturalization Oath Ceremony, *available at* https://www.ilw.com/forms/N445.pdf.

The court's order approving Mr. Kabura's Application does not limit USCIS's ability to

complete its updated background check[3] or to verify the information he provides on his Form N-445.  Rather, as set forth below, the court instructs USCIS to treat Mr. Kabura as it would treat any other applicant whose application has been approved and is ready to take the Oath and receive a Certificate of Naturalization.

## CONCLUSION AND RELIEF GRANTED

Under 8 U.S.C. § 1447(b), the court has jurisdiction to determine Mr. Kabura's Application for Naturalization.  After reviewing that Application, along with the evidence submitted to the court, the court **HEREBY DETERMINES** that Mr. Kabura has satisfied the necessary requirements to be naturalized as a citizen of the United States and therefore **APPROVES AND GRANTS HIS APPLICATION**.  Exhausting the powers and jurisdiction granted to it under § 1447(b) and the governing statutory scheme, the court finds that this matter must now **REMAND** back to USCIS so that Mr. Kabura's naturalization process can be completed.  The process governing Mr. Kabura's naturalization should proceed in the same manner as would any applicant's whose application for naturalization had been internally approved by USCIS.  As such, and in conformity with this Order, the court **DIRECTS** USCIS to:[4]

1.      Schedule Mr. Kabura to participate in the next-scheduled ceremony for taking the Oath of Renunciation pursuant to, and consistent with, 8 U.S.C. § 1448 and 8 C.F.R. § 310.3;

---

[3]  Mr. Kabura asserts that USCIS need not conduct a further update, as he testified at the Evidentiary Hearing that he has not been charged with, arrested for, or convicted of any incidents other than the Violation and because he has submitted an official Utah criminal history record that shows he has had no other criminal incidents.  (ECF No. 45-6).  Even if the court was to accept Mr. Kabura's testimony and updated Utah criminal report as being equivalent to a USCIS background check, the court is still without information as to Mr. Kabura's record since March 13, 2019.  Verification is required.

[4]  As discussed above in Section A, the actions USCIS are herein ordered to take are consistent with, and not an infringement on, its "sole authority to naturalize persons as citizens of the United States" granted by 8 U.S.C. § 1421(a) and are not prohibited under 8 U.S.C. § 1429 from being ordered by the court or undertaken by USCIS,.

2. Prepare and distribute to Mr. Kabura a Certificate of Naturalization pursuant to 8 U.S.C. § 1449;

3. In preparing for Mr. Kabura's taking of the Oath and receiving the Oath of Renunciation, conduct a **LIMITED UPDATE** to Mr. Kabura's background. This check shall be limited to the periods between Mr. Kabura's Examination, being December 21, 2016, and the date before he is to take the Oath; and

4. Complete any actions, that are not inconsistent with the relief granted herein, as are customary to complete the naturalization of an alien whose application for naturalization has been approved.

DATED this 24th day of March, 2020.

BY THE COURT:

Clark Waddoups
United States District Judge